## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>Plaintiff, )<br><br>vs. )<br><br>GARY PATTERSON )<br><br>Defendant. )<br>⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) | CASE NO. 04-9146-M-01 |

### MEMORANDUM AND ORDER

The court now considers Defendant's Motion to Suppress all evidence and any fruits of such evidence which was seized from Defendant's person and from the automobile in which Defendant was riding on April 4, 2004. (Doc. 11). The Government filed a response (Doc. 16), and a hearing was held at Fort Riley, Kansas, on October 7, 2004. The Government called two witnesses, M.P. Corey McDonald and William Jonathan Pennington, and admitted Government Exhibits 1 through 3. Defendant testified for the limited purpose of establishing standing. Defendant's Exhibits A through C were admitted by stipulation of the parties. Defendant's Exhibit D was a drawing of the gate area made during the hearing by witness McDonald and it was also admitted into evidence. Thereafter, the parties filed supplemental briefs (Doc's 19 & 20). The court has reviewed the filings and

after hearing the evidence finds that Defendant's Motion to Suppress should be DENIED for the reasons set out in this Memorandum and Order.

## FACTS

M.P. Corey McDonald is a canine handler who was on duty at Fort Riley on the evening of Saturday, April 3, and morning of Sunday, April 4, 2004. He was working with his dog, Baron Yankee 131 ("Baron"). McDonald attended MP School in 2001, took additional classes in Korea, and attended the Canine School at Lackland AFB for three months with Baron. Baron was trained to detect numerous drugs including marijuana, hash, cocaine, methamphetamine and ecstasy, and during a week-long training session, Baron was certified with a test score of 90%.[1]

During the early morning hours of Sunday, April 4, 2004, McDonald and Baron were doing walk-around vehicle inspections at various gates at Fort Riley. Trooper Gate experiences heavy traffic on Saturday nights so walk-around inspections were only conducted on every third vehicle. McDonald would start Baron at the passenger side rear quarter panel of a vehicle and walk him around the entire vehicle testing both high and low. If Baron responded on a vehicle, it was pulled out of the lane of traffic to another area for follow-up so that it would not

_____

[1] Baron was retired in approximately May, 2004, at 9 years of age.

impede traffic flow at the gate.

McDonald identified the Defendant and remembered him.  He related that he had inspected a car in which Defendant was riding in the front passenger seat at approximately 0100 hours on Sunday Morning, April 4, 2004.  Baron responded to the passenger side of the vehicle and he would not move without receiving his toy. From his training, this indicated a positive response for drugs. McDonald instructed the driver to pull over to another area out of the flow of traffic.[2]  When McDonald approached the driver, Defendant stated to McDonald that the car was his uncle's, that Defendant did not know of any problem but in any event he, pointing to himself, would take full responsibility.  From his narcotics training, McDonald knew what marijuana smells like, its texture, use, etc.  His search of the car revealed a substance on the front passenger floorboard, the driver's seat and in the back which McDonald believed was marijuana residue, *i.e.,* seeds, leaves or stems.  The amount of residue was very small and it appeared to be discarded material.

McDonald testified that everyone going through a check point at any gate in

---

[2] On cross-examination, McDonald again described the procedure he used in checking vehicles and drew a map, Defendant's Exhibit D, showing the area where the driver of the vehicle was to go for further questioning and a search.  This was a lighted, concrete area immediately adjacent to the gate.

3

to Fort Riley is stopped and required to provide proof of insurance, automobile registration and a driver's license.  McDonald characterized Fort Riley as a "closed" post.  McDonald was also shown, and he identified, Government Exhibits 1 through 3 which are photographs (taken on October 6, 2004) of a warning sign on the road leading up to Trooper's Gate taken from various angles.  While McDonald acknowledged that there had been a lot of construction work at the gates at Fort Riley, he did not see any construction at Trooper's Gate on April 4, 2004, and as far as he could remember the sign was in place on that date.

On cross-examination, McDonald testified that Baron was not trained to detect explosives, and at Fort Riley dogs were used on patrol and to detect drugs. Baron was tested every month while he was in service for accuracy and was only retired due to arthritis in his hips. At the time of the search in this case, Baron was still performing his duties accurately.

When on duty, McDonald is given a schedule of check points where he is to patrol with Baron, and he can also be called out for special uses.  He conducts "random vehicle inspections" at the gates and does not inspect every vehicle.  At the time of the search in this case, it was left up to the handler to decide the "random number" of vehicles to be inspected, *i.e.,* whether to inspect every third vehicle, etc.  Sometimes the guards on the gate would make a recommendation

4

based on traffic volume.  With heavy traffic on Saturday nights, he usually decided

to do either every third vehicle or every fifth vehicle.  On the date of the stop in

this case, he had no written instructions as to which vehicles to stop, and it was

totally up to the dog handler how he determined the number.  Now there are

written instructions given to the dog handler that specifically describe the

procedures to be followed.  As to his definition of an "open" versus a "closed"

post, McDonald indicated that he had been taught during classes at Fort Leonard

Wood that an "open" post was one where the public could drive on and off post

without being stopped.

William Jonathan Pennington has been at Fort Riley since 1994.  He has

lived both on and off post.  In 1994-1995, anyone could drive onto or through Fort

Riley without being stopped.  Pennington has lived in Junction City since 2000.

Prior to September 11, 2001,  the shortest and easiest way to travel from Junction

City to Manhattan, Kansas was to drive through Fort Riley.  This all changed after

9/11 because improvised check points were installed and MP's searched almost

every vehicle, also checking for insurance and driver's licenses. After 9/11,

members of the civilian community worried that the gates located on the roads

through Fort Riley might be totally closed or subject to severely restricted access,

and there were several articles in the local newspapers about this.  There were

5

always signs identifying Fort Riley, but after 9/11 the signs had instructions about searches of vehicles, use of seat belts, etc.  In the past few months before the hearing in this case, Pennington used Trooper's Gate only 3 or 4 times a month, but prior to that time it was his main way home and he was through that gate 4 to 5 times per week.  He noticed the signs at Trooper's Gate in late 2001 or early 2002 with the warnings about an access control point ahead and possibility of vehicle searches.  In the past year, some of the signs at Trooper's Gate were moved in location, but he can not remember a time when did not see a sign there.

On cross-examination, Pennington admitted that before 9/11, access to some posts (such as Andrews AFB) was more restricted than at Fort Riley.  He also admitted that during construction around the gates, some signs were taken down and not just moved.  Pennington did not testify that the sign depicted in Government's Exhibits 1 through 3 was actually in place on the road leading to Trooper's Gate on the date of the stop in this case.

Defendant Gary Patterson testified that on the evening before he was stopped at Trooper's Gate, he borrowed his grandmother's car from his uncle.  He believed his uncle had the authority to loan the car to him, and he believed he had permission to use the car at the time it was stopped at Trooper's Gate.  Patterson has lived in Junction City, Kansas his entire life.  He did not remember seeing a

6

sign as he approached the gate and fenced area that he knew was Fort Riley.

## DISCUSSION

Defendant argues that when his car was stopped at the Trooper's Gate entrance to Fort Riley, this was a seizure, and that the subsequent search of his car by McDonald was unreasonable, and therefore unconstitutional, because the officers had no individualized suspicion of criminal activity by Defendant or other occupants of the car.  (Doc. 11 at 3).  A search conducted without a warrant is *per se* unreasonable under the Fourth Amendment, subject only to a few well delineated exceptions.  While the Fourth Amendment generally prohibits warrantless searches without probable cause, there are a few narrow exceptions, and when considering those exceptions, the underlying constitutional requirement of reasonableness still applies.  Morgan v. United States, 323 F.3d 776, 780-81 (9th Cir. 2003).

This court has considered the constitutionality of stops at checkpoints at Fort Riley in two prior cases: United States v. Dillon, 983 F.Supp. 1037 (D. Kan. 1997); United States v. Baumgartner, Case. No. 03-M-9304-01, Memorandum and Order of February 26, 2004.  Dillon involved two drunk driving and vehicle inspection checkpoints set up on Fort Riley, and Baumgartner involved a "war on guns" checkpoint at the Ogden Gate entrance to Fort Riley.  In both cases, after the

7

vehicles were stopped at the checkpoint, a military police officer detected a strong odor of alcohol, field sobriety tests were administered and an arrest for DUI was made.  In both cases, the court upheld the validity of a search conducted without a warrant at the checkpoint.  This case differs slightly from the prior two cases since the stop in this case was a routine stop which occurred at a gate leading onto Fort Riley rather than at a specially designated checkpoint, and also because the search of the vehicle in this case was initiated as a result of an alert on defendant's car by a drug dog which occurred while defendant's car was stopped in line waiting clearance to enter Fort Riley.

In contending that the search in this case violated the Fourth Amendment, Defendant argues that: (1) Fort Riley is an open base where civilians have a much broader measure of Fourth Amendment protection; (2) the checkpoint system at issue in this case is for the general purpose of crime control rather than base security; (3) the search in this case was not accompanied by sufficient safeguards to limit the discretion of the officers operating the checkpoint; (4) the duration of the stop exceeded the brief stop and minimal intrusion authorized by prior cases; and (5) the sign on the road into Fort Riley which warned persons that they would be subject to search upon entry onto the fort may not have been in place on the date of the search in this case due to construction activity around the gate.

8

We commence our examination in this case by reviewing recent Supreme Court cases concerning stops at checkpoints. In Michigan Dept. of State Police v. Sitz, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), the Court upheld the use of a sobriety checkpoint where there was an initial stop of a motorist passing the checkpoint and the associated preliminary questioning and observation, but cautioned that "[d]etention of particular motorists for more extensive field sobriety testing may require satisfaction of an individualized suspicion standard." 496 U.S. at 451.

Later, in City of Indianapolis v. Edmond, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), the Court held that a drug checkpoint that had as its primary purpose interdiction of illegal narcotics involved the uncovering of evidence of general criminal wrongdoing, and such a program contravened the Fourth Amendment. The Court, however, was careful to limit the reach of its holding. The Court noted that it was specifically not deciding whether a State could establish a checkpoint program with the primary purpose of checking drivers licenses or driver sobriety, and a secondary purpose of interdicting narcotics. 531 U.S. at 47, n. 2. Likewise, the Court expressed no opinion on whether police could expand the scope of a license or sobriety checkpoint seizure in order to detect the presence of drugs in a stopped car. Id. The Court did note that "[t]he fact that

9

officers walk a narcotics-detection dog around the exterior of each car at the

Indianapolis checkpoints does not transform the seizure into a search." 531 U.S. at

40.  Finally, the Court noted that its holding does not affect the validity of border

searches or searches at places like airports and government buildings, where the

need for such measures to ensure public safety can be particularly acute; likewise,

it does not impair the ability of officers to act appropriately on information they

properly learn during a checkpoint stop justified by a lawful primary purpose, even

where such action may result in the arrest of a motorist for an offense unrelated to

that purpose.  531 U.S. at 47-48.

At the hearing in this case, there was no detailed testimony about the

primary purpose behind the use of checkpoints at the gates leading in to Fort Riley.

However, from a review of the Operating Procedures of AKAL[3] it appears clear

that guards at the checkpoints or control points at the gates were to: (1) control

access to the post by requiring verification of ID for all soldiers and all civilians

who attempt to enter the fort; (2) deny entry to unauthorized personnel; (3) report

suspicious activity; and (4) close the gate when required.  Defendant's Exhibit A at

1.  In conducting their checkpoint duties, guards were to: (1) ensure that ID's were

---

[3] At the time of the stop in this case, AKAL was providing security services at the gates at Fort Riley rather than the military police.

10

not expired or mutilated and that the person entering was the person identified on

the ID; (2) check all military and civilian ID; (3) make certain that all person over

18 years of age had an ID; (4) conduct a visual inspection of the interior of all

vehicles; (5) turn vehicles to the visitor center if they did not have a DOD decal;

(6) compare all ID of occupants of non-DOD decaled vehicles to make certain that

they are not on a bar list or AWOL list; and (7) conduct random checks of

occupants of decaled vehicles with the bar list and AWOL list.  *Id.* at 3.

Testimony at the hearing did confirm that all civilians coming on to the fort were

required to display a drivers license or appropriate ID, automobile registration and

proof of insurance.  These are items clearly and directly related to highway safety

issues and not interdiction of narcotic drugs or other general criminal activity.  In

addition, some of the specific functions identified in the AKAL memo clearly

relate to base security, *e.g.,* the instruction to visually inspect the interior of each

vehicle and to check for persons on the bar list who are not allowed to come onto

the post.  Importantly, nothing in the evidence presented indicates that the <u>primary</u>

purpose of the checkpoints at the Fort Riley gates is the detection of drugs or other

general criminal activity.[4]  Nor are the procedures used at the gate checkpoints

---

[4] If the primary purpose of the gate stop was drug detection, drug dogs would
be either used at each gate continuously, or cars would only be stopped at the gate at
the times a drug dog was available.  That is not done at Fort Riley.

"random" in nature since <u>all</u> vehicles coming on to the fort are required to stop and provide the requested information.

While a stop at a checkpoint constitutes a seizure for Fourth Amendment purposes, defendant does not really attack the constitutionality of the initial stop in this case, but rather questions the constitutionality of the subsequent dog sniff and the manual search of his car. The court finds that the primary purpose of stopping all cars at the gates into Fort Riley was not detection of general criminal conduct, and such a stop was not so invasive or of such duration as to violate the reasonableness test.[5]

In reaching its decision, the court has considered the parties' arguments about whether Fort Riley is an "open" or "closed" post. A review of the cases cited by the parties leads the court to agree with Defendant's conclusion that the issue in this case does not turn on the existence of a stark dichotomy between "closed" and "open" bases. (Doc. 19 at 3). Most of the cases cited which make this distinction pre-date the events of September 11, 2001, and involve factual situations which stretch along a continuum from the most restrictive, *i.e.,* entry

_____

[5] Viewed in a light most favorable to Defendant, the most that could be said is that the checkpoint stop, combined with the occasional use of drug dogs, presents a case where drug detection was at most a secondary purpose. Even assuming that to be the case, <u>City of Indianapolis</u> does not proscribe such conduct, even if the scope of the initial seizure is subsequently expanded to detect drugs. 531 U.S. at 47, n. 2.

12

only on the specific written permission of the post commander, to the least restrictive, *i.e.,* a stop to check ID's.  While Fort Riley may be on the lower end of this continuum, it is clearly not the "open" base that it was prior to 9/11, when everyone drove through Fort Riley as the shortest route between Junction City and Manhattan, without being stopped or checked in any manner.[6]  Clearly, however, even posts which may fall on the lower end of the spectrum of impediments to entry are entitled to establish procedures related to post security and traffic and/or highway safety.  <u>United States v. Green</u>, 293 F.3d 855, 861 (5th Cir. 2002).  And, as this court said in both <u>Dillon</u>, 983 F. Supp. at 1040, and <u>Baumgartner</u>, Memorandum and Order at 9, courts should be reluctant to intrude upon military and national security affairs, and should give great deference to law enforcement officials on military installations who conduct checkpoints.

Tied to the issue of "open" versus "closed" posts is the issue of whether there was a warning sign on the road leading to Trooper's Gate on the night of the stop.  The photos of the sign which was in place on October 6, 2004 – some six months <u>after</u> the date of the stop – show a normal warning sign which states that "UPON ENTERING FORT RILEY . . . ALL VEHICLES PERSONS AND

---

[6] As a practical matter, the court seriously doubts that there are very many truly "open" military installations in this country like Fort Riley was in the days prior to 9/11.

PROPERTY ENTERING FORT RILEY ARE SUBJECT TO INSPECTION."
Government Exhibit 3.   Signs like the ones depicted in Government Exhibits 1-3
have been located on the approaches to Fort Riley since 9/11, but due to
construction work around the gates, some of the signs may have been removed at
some times while construction progressed.  Defendant testified that he did not
recall seeing a sign, while McDonald testified that as far as he could remember, the
sign was in place on the night of the stop.  Pennington testified that he could not
recall a time when there he did not see a sign on the road leading to Trooper's
Gate.  While the evidence on this point is somewhat inconclusive, the weight of the
evidence supports a finding that a warning sign of the type shown in Government
Exhibits 1-3 was located at some place on the road leading to Trooper's Gate at the
time of the stop in this case.

However, even assuming, *arguendo,* that such a sign was temporarily
removed from Trooper's Gate on the night of April 3, 2004, this is not
determinative.  Defendant has resided in Junction City his entire life and testified
that he knew he was approaching Fort Riley when he saw the fences and military
uniforms.  Clearly he knew where he was when he saw a line of cars waiting to
proceed through Trooper's Gate.  Under the totality of the circumstances of this

14

case,[7] even if the sign had been temporarily removed, that fact alone does not invalidate the stop and search in this case.

The court has also considered the argument that the officers operating the checkpoint, either the AKAL personnel or McDonald, had too much discretion in the operation of the checkpoint.  First, as to the initial stop, all cars coming onto Fort Riley were required to stop at the gate for inspection of ID.  There was no discretion about this procedure.  As to how McDonald decided to use his dog, however, this was left entirely up to him.  That fact, however, does not turn the dog sniff into a "random" vehicle stop of the type condemned in prior cases.

In Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), a patrolman saw a car in the area and since he wasn't answering any complaints, decided to pull it over to check the driver's license and registration, even though he had not observed any traffic or equipment violation and he was not acting pursuant to any standards, guidelines or procedures concerning spot checks.  In finding the

---

[7] Even in cases involving closed military bases, the courts have looked at more than the existence of a warning sign.  For example, in United States v. Jenkins, 986 F.2d 76, 79 (4th Cir. 1993), the court not only discussed the warning sign, but also the presence of a barbed wire fence, security guards at the gate, "and a civilian's common-sense awareness of the nature of a military base" and concluded that all of these circumstances combine to puncture any reasonable expectation of privacy for a civilian entering the base.

15

search unreasonable under the Fourth Amendment, the Court distinguished the truly "random" traffic stop from cases involving border checkpoints.  The Court also noted that its holding "does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion.  Questioning of all oncoming traffic at roadblock-type stops is one possible alternative."  440 U.S. at 663.  In a concurring opinion, Justices Blackmun and Powell also assumed that other not purely random stops (such as every 10th car to pass a given point) could be appropriate.  440 U.S. at 663-64.

In this case, McDonald did not conduct truly "random" vehicle inspections with Baron; instead, he decided in advance the formula he would use to decide which cars to walk around with Baron, *i.e.,* every third or every fifth car, based on the amount of traffic flowing through the gate.  While he did not have written instructions outlining specifically how he was to make this decision, the testimony is clear that once he made the initial decision to inspect every third car, he did not vary from that decision, and he would only command Baron to walk around the requisite cars.  On cross-examination, McDonald further testified that if Baron did not alert on a car, he would not pull it out of line for a further search even if he (McDonald) smelled smoke rolling out of a car window that he believed it smelled

16

like marijuana.  While it is preferable that a dog handler receive instructions from his superior in the form of a standard procedure to be followed in conducting the vehicle inspections (as is now the case), there is no indication that McDonald's actions in this case were impermissible.  Defendant's car was selected because it was the third car in the line, not because McDonald used his discretion to randomly select it out of all other cars waiting in line.  There was absolutely no evidence that Defendant's car had been "singled out" for inspection or that Defendant was treated arbitrarily.  In fact, having the dog sniff only every third car, rather than every car passing through the gate, counters any suggestion of a subjective intrusion.  *See e.g.,* United States v. Green, 293 F.3d at 860.

Moreover, as previously noted, the Court in City of Indianapolis specifically stated that use of a drug dog at a checkpoint does not convert a seizure into a search since the dog is outside the car.  531 U.S. at 40. And, the use of drug detection dogs in situations where there is no particularized suspicion of illegal conduct has been approved in a recent case handed down by the Supreme Court after the suppression hearing in this case.  In Illinois v. Caballes, 543 U.S. __, 125 S.Ct. 834, 160 L.Ed.2d 842 ( 2005), the Court held that a dog sniff conducted during a concededly lawful traffic stop, that reveals no information other than the location of a substance that no individual has any right to possess, does not violate

17

the Fourth Amendment.  In that case, an officer had stopped the defendant for speeding and, while writing the ticket, another officer with a drug dog arrived and walked around the car.  When the dog alerted, the officers then searched the trunk and found marijuana and arrested the defendant.  The entire incident lasted less than 10 minutes.

While <u>Caballes</u> involved use of a drug dog in connection with a lawful traffic stop rather than a lawful stop at the gate to a military installation, the case is instructive.  If the initial stop is legal, a drug dog can be employed even though there is no particularized suspicion that the subject has violated any drug law without infringing on the person's constitutionally protected interest in privacy. Therefore, the fact that McDonald walked Baron around the car in which Defendant was riding while it was stopped in line waiting for clearance to pass through Trooper's Gate does not constitute an illegal search that would violate the Fourth Amendment.  The actual search of the car in this case was only done by McDonald after (and because) Baron had alerted on the car in which Defendant was a passenger.  This is sufficient individualized suspicion and probable cause for McDonald to initiate a search of the car for the presence of drugs.  *See* <u>United States v. Williams</u>, 403 F.3d 1203, 1207 (10th Cir. 2005); <u>United States v. Rosborough</u>, 366 F.3d 1145, 1153 (10th Cir. 2004).

18

Finally, there is no evidence that the duration of the stop was unreasonable. In fact, no testimony was presented as to precisely how long Defendant's car was detained after Baron alerted on it and it was moved out of line for follow up.  Since the area where the car was directed for further questioning and ultimately a search was immediately adjacent to Trooper's Gate, *see* Defendant's Exhibit D, and lacking any specific testimony of undue delay, the court is not convinced that the length of time for the stop, canine walk-around and search was unreasonable.

For all of the above reasons, the court finds that the initial stop, the use of a drug dog and the resulting search in this case was reasonable and does not violate the Fourth Amendment.  Defendant's Motion to Suppress (Doc. 11) is therefore DENIED.

Dated at Wichita, Kansas, this 26th day of May, 2005.

      s/   Donald W. Bostwick
DONALD W. BOSTWICK
United States Magistrate Judge

19